14-1546-cv
Dean v. University at Buffalo School of Medicine and Biomedical Sciences, et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Argued: February 19, 2015          Decided: October 6, 2015)

Docket No. 14-1546-cv

_____

MAXIAM DEAN,

*Plaintiff-Appellant,*

v.

UNIVERSITY AT BUFFALO SCHOOL OF MEDICINE AND BIOMEDICAL
SCIENCES, STATE UNIVERSITY OF NEW YORK, MICHAEL E. CAIN, M.D.,
Individually and in his official capacity as Dean of the University at Buffalo
School of Medicine and Biomedical Sciences, NANCY NIELSEN, M.D., Ph.D.,
Individually and in her official capacity as Senior Associate Dean of the
University at Buffalo School of Medicine and Biomedical Sciences,

*Defendants-Appellees.*

_____

Before: WINTER, POOLER, SACK, *Circuit Judges.*

Appeal from the United States District Court for the Western District of New York (William M. Skretny, *J.*) granting summary judgment to defendants and dismissing plaintiff Maxiam Dean's claims under, inter alia, Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, and the Due Process Clause. After failing to sit for and pass his third attempt at Step 1 of the United States Medical Licensing Examination by the deadline set by the University at Buffalo School of Medicine and Biomedical Sciences, Dean was dismissed from the M.D. program. Because defendants did not grant Dean the accommodation he requested for his mental-health condition and failed to provide a "plainly reasonable" alternative or attempt to show that Dean's proposed modification was unreasonable, the district court erred in granting summary judgment on the ADA and Rehabilitation Act claims. However, having received notice of potential termination from the program and a "careful and deliberate" decision Dean was provided the procedural process due for an academic dismissal.

Affirmed in part, vacated in part, and remanded.

_____

PARKER R. MACKAY (David J. Seeger, Buffalo, NY, *on the brief*), Kenmore, NY, *for Plaintiff-Appellant*.

2

LAURA ETLINGER, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, Andrea Oser, Deputy Solicitor General, *on the brief*), *for* Eric T. Schneiderman, Attorney General of the State of New York, Albany, NY *for Defendants-Appellees.*

POOLER, *Circuit Judge*:

Plaintiff-Appellant Maxiam Dean appeals from the judgment of the United States District Court for the Western District of New York (William M. Skretny, *J.*) granting summary judgment to the University at Buffalo School of Medicine and Biomedical Sciences ("UBMED"), State University of New York ("SUNY"), Michael E. Cain, and Nancy Nielsen (collectively "Defendants") and dismissing his complaint. Dean brought suit under, inter alia, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and 42 USC § 1983 for alleged violations of the Due Process Clause of the United States Constitution. After failing to sit for and pass his third attempt at Step 1 of the United States Medical Licensing Examination ("USMLE") by the deadline set by UBMED, Dean was dismissed from the M.D. program. Because a trier of fact could find that defendants did not grant the accommodation Dean requested for his mental-health condition and failed to provide a "plainly reasonable" alternative or attempt to show that Dean's

proposed modification was unreasonable, the district court erred in granting summary judgment on the ADA and Rehabilitation Act claims. However, having received notice of potential termination from the program and a "careful and deliberate" decision Dean was, as a matter of law, provided the procedural process due for an academic dismissal.

Accordingly, we affirm the grant of summary judgment to Defendants as to Dean's due process claim, vacate the remainder of the judgment, and remand to the district court.

## BACKGROUND

Maxiam Dean enrolled in the four-year M.D. course at UBMED in August 2004. The program is divided in two phases, each comprising two years of study. To progress to the latter stage a student must pass all first-phase modules and electives, a second-year clinical competency examination, and Step 1 of the USMLE administered by the National Board of Medical Examiners ("NBME"). Dean completed the required coursework and second year clinical competency exam by the spring of 2006.

The Academic Status Policies ("ASP") issued by UBMED permits a student three opportunities to pass the Step 1 exam, with all attempts to be completed in

one academic year exclusive of official (non-study) leaves of absence. A student who thrice fails the Step 1 exam is to be administratively dismissed, but may appeal to the dean of UBMED. Under this policy Dean was required to complete Step 1 of the USMLE by May 31, 2007.

UBMED allowed Dean study leave before his first and second attempts at the Step 1 exam. In June 2006, Dean took a six-week leave to prepare for the examination but failed it in mid-August 2006. Dean thereafter received three additional six-week study leaves. Although the ASP provides only eight weeks for a student to prepare for a second sitting of the Step 1 exam, UBMED granted Dean's requests. Prior to his second attempt, senior associate dean Dr. Nancy Nielsen wrote to Dean on January 4, 2007, informing him that by the terms of his leave of absence he would be "automatically dismissed from medical school" if he failed to sit for Step 1 by February 17, 2007, and that no extensions for further study would be granted. App'x at 177. Dean replied by email to Dr. Nielsen explaining that he had enrolled in the PASS Program, a private examination preparation course consisting of lectures and tutoring, to prepare for the USMLE, which Dean understood he could sit for as late as May 31, 2007. Dean noted that prior to attending the program he was "ridden with depression, stress, and

5

anxiety," App'x at 231, asked for an "extra month in the Pass Program to succeed" but did not request medical leave. App'x at 232. Dean ultimately retook Step 1 on February 16, 2007, and again failed.

Dr. Nielsen informed Dean by letter that he would go on study leave at the end of his current medical clerkship to prepare for a final try (no later than May 31, 2007) at the Step 1 exam. The ASP does not prescribe a particular study period for a third attempt but states that the student will be removed from the clerkship roster and "allowed to prepare for, and sit for, the examination one final time. [The student] must sit for the examination by the date established by the Office of Medical Education for the next incoming third year class." App'x at 142. Former faculty member and chair of surgery Dr. Eddie Hoover attested that "it was longstanding policy that students taking the Step 1 exam, whether on their first, second or third attempt, were afforded a 6 to 8 week period to prepare." App'x at 339. In particular, he emphasized that "each time a medical student took the Step 1 exam, he or she was allowed and expected to study exclusively for the exam for a 6 to 8 week period leading up to the examination itself." App'x at 339. In his deposition, Dean similarly testified that all students were afforded a six- to eight-week study leave prior to each attempt.

6

Sometime after failing the Step 1 exam for a second time Dean became disabled. In April 2007, he began to experience increased symptoms of depression, and on May 4, 2007, Dr. Andrea Greenwood, a psychologist, conducted a crisis evaluation session with Dean through the university's counseling services. Dean reported disrupted sleep and appetite, fatigue, and difficulty concentrating.  Dr. Greenwood advised Dean to schedule a comprehensive evaluation. That same day Dean met with Dr. Dwight Lewis, an internist, who proposed that Dean begin pharmacological treatment and provided Dean an "excuse slip" recommending a three-month leave of absence due to situational depression.

Dean presented the slip to UBMED and received responses from Dr. Nielsen, by letter and email, informing him that Dr. Lewis's note provided insufficient information to support an extended leave. Dr. Nielsen advised Dean that the dean of UBMED, Dr. Michael Cain, would not grant any additional extensions and that Dean was to sit for Step 1 by May 31, 2007. After learning that Dean independently inquired of UBMED's leave of absence committee, Dr. Nielsen notified Dean that Dr. Cain had already reviewed his physician's note and declined to grant an extension. In a separate letter Dr. Nielsen stated that

7

Dean would "be immediately administratively dismissed from school" upon receipt of a failing score on the Step 1 exam. App'x at 175.

Dr. Greenwood re-evaluated Dean on May 17, 2007. In a letter to Dr. Nielsen and the leave of absence committee she outlined the symptoms of Dean's depression, noting effects on his ability to concentrate and maintain focus and opining that Dean would likely benefit from treatment. The following day Dr. Lewis prescribed Dean Lexapro, an anti-depressant medication. As a follow up to the earlier excuse slip, Dr. Lewis also wrote to the committee recommending a medical leave of absence to permit Dean to return to proper functioning such that he would be "capable of the academic performance required to advance in his medical training." App'x at 300. Neither Dr. Greenwood nor Dr. Lewis suggested a particular period of leave.

Dean wrote separately to the leave-of-absence committee on May 21, 2007, describing his symptoms and requesting a three-month leave to continue the medication regimen, visit the university psychologist, and temporarily return home for family support. He indicated that "[a]t the end of the leave [he would] sit for the retake of step 1 and return back to clinical clerkship." App'x at 296.

After meeting with Dean, the leave-of-absence committee endorsed a leave of absence until June 30, 2007, a date approximately six weeks after Dean began taking Lexapro. The committee's May 22, 2007 letter to Dr. Nielsen noted that leave should be granted to permit adequate time for the treatment to become effective but that Dean "should not be granted a leave of absence to gain more 'study time'" and counseled that no further leave be granted. App'x at 302. Accepting the committee's recommendation, Dr. Cain informed Dean by letter dated May 25, 2007, of the extended deadline but stated that "[n]o further delays whatsoever w[ould] be granted" and reminded Dean that he was required to pass Step 1 within the three attempts permitted by the ASP before returning to the M.D. program. App'x at 306.

On May 31, 2007, Dean attended a follow-up appointment with university psychiatrist Dr. Calvert Warren, who furnished Dean with a letter indicating that despite mild improvement since beginning treatment on May 18, Dean exhibited symptoms of major depression. Dr. Warren supported a leave of absence to permit Dean's treatment interventions to progress and noted a six- to eight- week timeframe for anti-depressant medications to achieve effectiveness. Dean forwarded Dr. Warren's letter to Dr. Cain and enclosed his own letter dated June

9

1, 2007, again requesting a three-month leave of absence: "Please reconsider giving me more than one month so that the medication will reach steady state and be therapeutic, so I can focus on preparing for the retake of Step 1." App'x at 311. By letter dated June 7, 2007, Dr. Cain allowed Dean until July 28, 2007, to sit for the Step 1 exam but stated that "no further extensions regardless of reason" would be granted. App'x at 313. The July 28 deadline fell approximately ten weeks after Dean began drug therapy for his depression.

While re-enrolled in the PASS Program, Dean experienced "a noticeable improvement in his functioning" in late June 2007. App'x at 20. By mid-July, approximately eight weeks after commencing treatment, Dean "regained normal functioning" and was able to intensively study. App'x at 20.  Dean reported being "virtually free of depression" on July 21. App'x at 243. Two days later, Dr. Francis Ihejarika, the founder of the PASS Program, left a voicemail for Dr. Cain, expressing confidence that Dean would be successful on the Step 1 exam with an additional month of preparation time. Dr. Nielsen informed Dean by email that due to privacy regulations the school would not return Dr. Ihejirika's call. Dean ultimately did not sit for the Step 1 exam by July 28, 2007, and did not request further extension of that deadline.

10

By letter dated August 15, 2007, UBMED notified Dean that he had been administratively dismissed from the M.D. program for failure to timely sit for the Step 1 exam. The letter informed Dean that he could appeal and that Dr. Nielsen would review the process, purportedly outlined in the ASP, with him should he so desire. Dean did not appeal. However, in late August he attempted to register for the Step 1 exam. NBME rejected the registration as Dean was no longer enrolled in a medical school.

Dean subsequently filed a complaint with the U.S. Department of Education's Office of Civil Rights ("OCR"). In May 2008, OCR concluded that Defendants "granted [Dean] a leave of absence consistent with the recommendations made by [Dean's] medical team," and found "insufficient evidence to support [Dean's] allegation that the School discriminated against him, on the basis of his disability, by refusing to grant him an additional month's leave of absence." App'x at 112. With this complaint pending Dean wrote to Dr. Cain requesting a meeting to discuss his dismissal. Dr. Cain declined to meet during the OCR investigation but invited Dean to submit additional information at the conclusion of those proceedings. In July 2008, Dean formally sought reinstatement arguing that his failure to sit for the Step 1 exam was not an act of

11

defiance, and submitted a letter from Dr. Hoover noting that it was "impractical" for Dean to study for the exam "with his degree of depression." App'x at 109. UBMED rejected Dean's request for reinstatement. Because Dean was dismissed from UBMED he is ineligible to transfer to another American medical school.[1]

Dean commenced this action in the district court bringing claims against Defendants under: Title II of the ADA; the Rehabilitation Act; 42 U.S.C. § 1981; and 42 U.S.C. § 1983. Seeking money damages and reinstatement, Dean alleged that his dismissal from UBMED resulted from discrimination on the basis of disability and race. Upon completion of discovery, Defendants moved for summary judgment. The district court granted the motion and dismissed the case in its entirety, finding, inter alia, "no plausible inference" of discrimination against Dean as a result of his disability, *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, No. 10-CV-209S (Sr), 2014 WL 1316186, at *7 (W.D.N.Y. Mar. 31, 2014), or that the medical leave afforded "insufficient accommodation or otherwise disadvantaged [Dean] as compared to able-bodied students required to complete all attempts at the Step 1 exam within one academic year," *id*. at *7

---

[1] Though of no consequence to the outcome of this appeal, Dean attests that in 2010, with sponsorship from a Caribbean medical school, he registered for, sat for, and passed Step 1 of the USMLE.

n.5. On the due process claim, the district court concluded that because academic dismissals require only notice and a "careful and deliberate" decision, Defendants provided Dean the process due under the circumstances. *Id*. at *9.

On appeal, Dean challenges the grant of summary judgment to Defendants on the ADA, Rehabilitation Act, and due process claims.[2]

**DISCUSSION**

**I.** **Standard of Review**

We review an order granting summary judgment de novo, drawing all permissible factual inferences in favor of the non-moving party. *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 271 (2d Cir. 2011). Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists only "where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Delaney v. Bank of America Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (quoting *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)). "[R]eliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion." *Davis v. New*

---

[2] Dean conceded before the district court that neither the ADA nor the Rehabilitation Act permit claims against state officials in their individual capacities. *Dean*, 2014 WL 1316186, at *5.

13

*York*, 316 F.3d 93, 100 (2d Cir. 2002). However, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82–83 (2d Cir. 2004) (quoting *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)).

**II.    ADA and Rehabilitation Act Claims**

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). To that end, Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id*. § 12132. A qualified individual with a disability is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for . . . participation in programs or activities provided by a public entity." *Id*. §

12131(2). A public entity includes a state or local government body or any instrumentality thereof. *Id*. § 12131(1).

Section 504 of the Rehabilitation Act provides, in pertinent part, that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity." 29 U.S.C. § 794(a). By its terms, the Rehabilitation Act, which was enacted prior to the ADA, applies only to programs receiving federal financial support. *Id*.; *see Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 85 (2d Cir.), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004).

Both acts "prohibit discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in . . . public accommodations." *Id*. The ADA defines "discriminate" as, inter alia, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless [the provider of the service] can demonstrate that the accommodation would impose an undue hardship on" its operations. 42 U.S.C. § 12112(b)(5)(A). Under the Rehabilitation Act "an

otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers . . . . [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." *Alexander v. Choate*, 469 U.S. 287, 301 (1985); *see Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 (2d Cir. 2003).

In the education context, the ADA and the Rehabilitation Act require a covered institution to offer reasonable accommodations for a student's known disability unless the accommodation would impose an "undue hardship" on the operation of its program, *Powell*, 364 F.3d at 88 (citing 28 C.F.R. § 41.53); *see Rothschild v. Grottenthaler*, 907 F.2d 286, 292 (2d Cir. 1990) ("Accommodations to permit access to handicapped persons should not impose 'undue financial and administrative burdens.'") (quoting *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 412 (1979)), or "'fundamentally alter the nature of the service, program, or activity,'" *Powell*, 364 F.3d at 88 (quoting 28 C.F.R. § 35.130(b)(7)); *see Alexander*, 469 U.S. at 300 ("[W]hile a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped, it may be required to make 'reasonable' ones."). Thus, while a covered entity "must make 'reasonable accommodations,' it does not have to provide a disabled individual

16

with every accommodation he requests or the accommodation of his choice."

*McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012); *see Fink v. N.Y.C. Dep't of Pers.*, 53 F.3d 565, 567 (2d Cir. 1995) (same)..

As the standards for actions under these provisions of the ADA and the Rehabilitation Act are generally equivalent, we analyze such claims together. *Harris v. Mills*, 572 F.3d 66, 73-74 (2d Cir. 2009). To establish a prima facie violation under these acts, a plaintiff must demonstrate "(1) that she is a 'qualified individual' with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability.'" *Powell*, 364 F.3d at 85 (quoting *Henrietta D.*, 331 F.3d at 272) (alterations omitted). Before the district court Defendants conceded that they were entities covered by the provisions of the acts, *Dean*, 2014 WL 1316186, at *6, and given their failure to address whether Dean was a "qualified individual with a disability," the district court assumed that Defendants conceded that issue for purposes of the summary judgment motion. *Id*. at *6 n.3. Thus, only the third prong of the prima facie

17

analysis was in issue—whether Defendants engaged in discrimination by failing to make reasonable accommodations.

Surveying the record, the district court discerned "no plausible inference that Defendants discriminated against Plaintiff or deprived him of an opportunity or benefit because of a disability such that a reasonable jury could find in his favor." *Id*. at *7. In support of this conclusion, the court noted that the period of medical leave granted by Defendants allowed Dean to return to normal functioning approximately two weeks prior to the Step 1 exam deadline and incidentally extended the time in which he could sit for the exam beyond the period ordinarily permitted. Moreover, the district court concluded that Dean had not shown that the accommodation he received was unreasonable, as he did "not offer[] any evidence indicating the leave he was granted failed to level the playing field or treat him in an even-handed manner with regard to the Step 1 exam." *Id*. (footnote omitted). That the period of leave granted complied with the general recommendations of Dean's doctors buttressed the district court's conclusion that the accommodation offered was sufficient. Finally, emphasizing that Dean had already devoted a year to study prior to his medical leave, the district court indicated that Dean's "opinion" provided the only support for his

18

contention that a reasonable accommodation would have included an additional period for study after the symptoms of his depression abated. *Id*. at *6, 7 n.5. The district court therefore granted Defendants' summary judgment motion on Dean's ADA and Rehabilitation Act claims.

On appeal, Dean contends that Defendants failed to provide a reasonable accommodation because he should have been afforded an interval of leave sufficient to allow the prescribed medication to take effect and for Dean to thereafter prepare for a final attempt at the Step 1 exam. Defendants respond that Dean sought medical leave solely for the purpose of undergoing treatment for depression and did not specifically request additional study time prior to the Step 1 retake. Thus, in ultimately supplying Dean a more generous leave period than purportedly requested by Dean and recommended by his physicians, Defendants assert they provided a reasonable accommodation. It is axiomatic that a claim for failure to accommodate does not lie where the accommodation received is the accommodation the plaintiff requested. *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 579 (2d Cir. 2003).

Dean was not afforded the accommodation he sought. In his June 1, 2007 letter to Dr. Cain requesting reconsideration of the leave of absence set to expire

19

at the end of that month, Dean asked for a three-month leave to allow "the medication [to] reach steady state and be therapeutic, so [he] c[ould] focus on preparing for the retake of Step 1." App'x at 311. While Dean did not explicitly disaggregate the purposes of the requested leave period, he explained that Dr. Warren had counseled that Dean "would need at least 6 to 8 weeks before [he] could see some improvement from the medication." App'x at 311. As Dean requested a period some five to seven weeks longer than necessary for the medication to become effective, a trier of fact could find that the additional time Dean sought was clearly to prepare for the Step 1 retake. The leave of absence committee had little difficulty discerning the dual purpose of Dean's request for leave. In its May 22, 2007 letter to Dr. Nielsen, the committee recommended that Dean's requested three-month leave period be limited to approximately six weeks of medical leave, as the "committee fel[t] that [Dean] should not be granted a leave of absence to gain more 'study time.'" App'x at 169. On this record, a reasonable juror could find that the leave Dean requested included a period for exam preparation and that Defendants understood the scope of his request.[3]

---

[3] Because Dean's requested three-month leave included time for exam preparation, the fact that his medical documentation did not endorse that leave

20

While Defendants did not provide the accommodation Dean sought, it is undisputed that they afforded him an alternative one. Dean was permitted a cumulative leave period spanning approximately ten weeks—from May 21, 2007, when he formally requested leave, until July 28, 2007, when he was required to sit for the Step 1 exam. The record establishes that by mid-July Dean's symptoms had lessened to the extent that he was able to engage in productive study. Thus, by the July 28 deadline, Dean enjoyed at least some depression-free study time. We must therefore decide, on the summary judgment record before us, whether this modification to the exam deadline was a reasonable accommodation.

Where a defendant's educational institution has implemented or offered an accommodation, the institution will be entitled to summary judgment only if the undisputed record reveals that the plaintiff was accorded a "'plainly reasonable'" accommodation. *Noll v. Int'l Bus. Machs. Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) (quoting *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 385 (2d Cir. 1996)). The hallmark of a reasonable accommodation is effectiveness. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) ("It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness."). The

period is neither material to whether the proposed accommodation was received nor dispositive of the reasonableness of that request.

21

accommodation need not be "perfect" or the one "most strongly preferred" by the student-plaintiff, but it still must be "effective," *Noll*, 787 F.3d at 95. Given the "fact-specific" nature of the question of whether a measure to accommodate a student's disability is a reasonable accommodation, this determination "must be made on a case-by-case basis." *Wernick*, 91 F.3d at 385.

Defendants posit that the accommodation offered Dean was reasonable since he had studied during two extended periods of leave prior to any reported mental health condition, such that additional study time would not have been necessary. In alluding to the year Dean spent preparing for the Step 1 exam, the district court appeared to embrace this theory.

We disagree. As an initial matter, we harbor serious doubt that earlier periods of study suffice to prepare a student for a later examination, particularly when the student twice failed that very exam. Further, contrary to the district court's conclusion, Dean offered evidence to establish that he was not treated in an evenhanded manner with respect to similarly situated students. *Cf. Doe v. Pfrommer*, 148 F.3d 73, 83 (2d Cir. 1998) ("[T]he central purpose of the ADA and § 504 of the Rehabilitation Act is to assure that disabled individuals receive 'evenhanded treatment' in relation to the able-bodied."). According to Dean's

22

evidence, UBMED granted a set period of study leave to students prior to each sitting of the examination. Dr. Hoover attested to a "longstanding policy" of affording students six to eight weeks exclusively for exam preparation prior to each attempt at Step 1 of the USMLE. App'x at 339. Dean similarly testified at his deposition. While it is unclear how many days or weeks Dean spent effectively studying after beginning pharmacological treatment, by any measure Dean's period of preparation time in late July 2007 did not span the six to eight weeks allegedly afforded, as a matter of school policy, to medical students who had also failed two prior attempts at the Step 1 exam. Given this policy, a juror could reasonably infer that the abbreviated study period encompassed within Dean's leave would not have been effective. *See Barnett*, 535 U.S. at 400 ("An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations."). We therefore cannot conclude that Defendants afforded Dean a plainly reasonable accommodation.

As we may affirm a grant of summary judgment on any basis that finds "sufficient support in the record, including grounds not relied on by the district court," *see Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 413 (2d Cir. 2014) (quoting *Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202, 205 (2d Cir.

23

2006)), we further consider, under the applicable burden-shifting framework

elaborated below, whether Dean's proposed accommodation would have been

reasonable, *see Noll*, 787 F.3d at 94.

We have not previously addressed the allocation of the burdens of

production and persuasion with respect to establishing the third prong of a

prima facie violation of the ADA or Rehabilitation Act—here the purported

denial of a reasonable accommodation—in the education context. However, in

employment-related claims based on a failure to accommodate, the plaintiff

bears the initial burdens of both production and persuasion as to the existence of

an accommodation that would allow the plaintiff to perform the essential

functions of the position in question, *McBride v. BIC Consumer Prods. Mfg. Co.*, 583

F.3d 92, 97 (2d Cir. 2009), as well as a "light burden of production" as to the facial

reasonableness of the accommodation, *id*. 97 n.3; *see Borkowski v. Valley Cent. Sch.*

*Dist.*, 63 F.3d 131, 138 (2d Cir. 1995) (plaintiff satisfies "burden of production" by

showing "plausible accommodation"). The burden of persuasion then shifts to

the defendant to rebut the reasonableness of the proposed accommodation.

*McBride*, 583 F.3d at 97 n.3. This burden of non-persuasion is in essence

equivalent to the "burden of showing, as an affirmative defense, that the

proposed accommodation would cause [the employer] to suffer an undue hardship." *Borkowski*, 63 F.3d at 138; *see Barnett*, 535 U.S. at 402 (finding summary judgment in favor of defendant appropriately granted where a plaintiff fails to present evidence from which a jury may infer that an accommodation "seems reasonable on its face, *i.e.*, ordinarily or in the run of cases," or where defendant "demonstrates undue hardship in the particular circumstances" of the case).

Similarly, in the education context, a plaintiff alleging a failure to accommodate a disability bears the burdens of both production and persuasion as to the existence of some accommodation that would allow the plaintiff to meet the essential requirements of the service, program, or activity at issue. Once the plaintiff has met the light burden of producing evidence as to the facial reasonableness or plausibility of the accommodation, the burden falls to the defendant educational-institution to persuade the fact-finder that the proposed accommodation is unreasonable. That burden may be met by establishing that the requested accommodation would (a) impose undue hardship on the operation of the defendant's service, program, or activity, or (b) require a fundamental or substantial modification to the nature of its academic program or standards. *See, e.g.*, *Powell*, 364 F.3d at 88 (allowing a student in medical school to

25

continue in program without passing Step 1 "would have changed the nature and substance of [the] program"); *Zukle v. Regents of Univ. of Cal.*, 166 F.3d 1041, 1049–51 (9th Cir. 1999) (rearranging medical clerkship rotations, reducing clinical hours, and otherwise decelerating schedule would lower medical school's standards); *McGuinness v. Univ. of N.M. Sch. of Med.*, 170 F.3d 974, 979 (10th Cir. 1998) (permitting student with marginal grades to advance in M.D. program as an exception to policy requiring repetition of coursework was a substantial rather than reasonable accommodation); *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 436–37 (6th Cir. 1998) (allowing student to attend abbreviated remedial summer program instead of retaking failed examination would diminish podiatric training standards); *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794–95 (1st Cir. 1992) (providing biochemistry test in an alternative format would lessen academic standards and devalue university's credentials as an institution).

Under this framework, Dean has made out a prima facie case of discrimination under the ADA and the Rehabilitation Act. As noted above, Defendants did not contest that Dean established the first two prongs of the inquiry—whether he is a qualified individual with a disability and whether

26

UBMED is a covered entity. In showing that he requested a three-month leave to seek medical treatment and study for the Step 1 retake, a trier of fact could find that Dean met his initial burdens of production and persuasion as to the existence of an accommodation. Further, the affidavit of Dr. Hoover and Dean's deposition testimony satisfied Dean's light burden to produce evidence with respect to the facial reasonableness of the accommodation. That students are ordinarily afforded six to eight weeks of study time prior to each attempt at Step 1 of the USMLE suggests that Dean's leave request was a plausible modification of UBMED's policies.

Thus, the non-persuasion burden falls to Defendants. In order to obtain summary judgment, it was incumbent upon Defendants to submit a factual record establishing that in rejecting Dean's requested scheduling modification they diligently assessed whether the alteration would allow Dean the opportunity to continue in the M.D. program without imposing undue financial and administrative burdens on UBMED or requiring a fundamental alteration to the academic caliber of its offerings. *See Powell*, 364 F.3d at 88. Where, as here, the record is devoid of evidence indicating whether Defendants evaluated these considerations in determining the reasonableness of the accommodation sought,

we decline to extend the deference we ordinarily accord to the professional, academic judgments of educational institutions. *See id.* (noting that in evaluating "the substance of a genuinely academic decision, courts should accord the faculty's professional judgment great deference" (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985)). To do otherwise might "allow academic decisions to disguise truly discriminatory requirements." *Zukle*, 166 F.3d at 1048. We do not mean to suggest that Defendants have obscured the basis for their decision to cloak discriminatory intent. Rather Defendants' failure to adduce evidence as to the basis for denying Dean's requested modification to the exam schedule precludes any conclusion on summary judgment as to the unreasonableness of that accommodation.

We therefore set aside the district court's grant of summary judgment to Defendants on Dean's ADA and Rehabilitation Act claims.

**III.   Procedural Due Process**

In the context of an academic dismissal a student is afforded the procedural process required by the Fourteenth Amendment where (1) the school has "fully informed [the student] of the faculty's dissatisfaction with [the student's] progress and the danger that this posed to timely graduation and

28

continued enrollment," and (2) "[t]he ultimate decision to dismiss [the student] was careful and deliberate." *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85 (1978). This standard reflects the need for "far less stringent procedural requirements," *id.* at 86, than those called for in disciplinary dismissal. *See Goss v. Lopez*, 419 U.S. 565, 581 (1975) (requiring school to furnish student facing suspension for misconduct: formal notice, an explanation of the evidence, and a chance to present a defense–though not a formal hearing). Given the "more subjective and evaluative" nature of the judgment school officials exercise in deciding whether to terminate a student for academic cause, such dismissals are "not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Horowitz*, 435 U.S. at90. "A graduate or professional school is, after all, the best judge of its students' academic performance and their ability to master the required curriculum." *Id.* at 85 n.2.

    Dean argues that UBMED failed to supply the procedural process owed to him under the circumstances of his dismissal from the M.D. program.[4] Further, he contends that his claim should not be analyzed under the framework for

---

[4] Defendants concede that Dean possessed a constitutionally cognizable property interest in the continuation of his medical school studies. *See Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991).

academic dismissals supplied by *Horowitz* and instead invites this Court to fashion an alternative standard. Such distinction is warranted, according to Dean, because UBMED's decision did not reflect an academic determination but instead was (1) motivated by animus and (2) undertaken automatically without exercise of professional judgment. We disagree. Under *Horowitz*, the appropriate standard to apply here, a trier of fact could find that Dean received both the requisite notice of potential dismissal and a "careful and deliberate" ultimate decision.

As an initial matter, we reject Dean's contention that this case requires application of a due process standard different from that articulated in *Horowitz*. Dean's allegation that Defendants' decision was motivated by ill will or bad faith is entirely conclusory with no support in the record to establish an inference of animus toward Dean. *See Clements v. Cty. of Nassau*, 835 F.2d 1000, 1005 (2d Cir. 1987) ("[S]ummary judgment is usually unwarranted when state of mind is at issue. The state of mind exception, however, is appropriate only where solid circumstantial evidence exists to prove plaintiff's case."(internal citation omitted)). Moreover, the decision to dismiss Dean plainly resulted from the exercise of professional judgment. It is true that the district court described

30

Dean's ultimate dismissal as "more ministerial than evaluative," *Dean*, 2014 WL 1316186 at \*9, but this finding does not compel the conclusion that the decision did not result from reasoned deliberation. Indeed, Dean does not dispute that Defendants exercised academic judgment in setting a deadline to sit for the Step 1 exam but argues that they should not have taken a final decision given the inherent possibility that he might require more medical leave. But that Defendants' final decision may have been premature goes to the substance of Dean's procedural due process claim and does not remove this case from the ambit of academic dismissals.

Next Dean argues that even under *Horowitz* Defendants failed to afford him the process due as (1) he was not warned of potential administrative dismissal, in part, because the ASP did not contain a provision specific to his situation; (2) Defendants' June 7, 2007 decision denying additional leave violated his right to a continued "give and take"; and (3) the ASP contained no effective right of appeal. None of these arguments is availing.

By failing to address the allegedly insufficient warning of dismissal in his opening brief, Dean has waived this argument. *See McCarthy v. S.E.C.*, 406 F.3d 179, 186 (2d Cir. 2005) ("[A]rguments not raised in an appellant's opening brief,

but only in his reply brief, are not properly before an appellate court . . . ."); *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993) ("It is true that the reply brief does 'reply' to arguments made by appellees in their answering brief. The fact that appellees felt compelled to address the merits out of caution does not, however, broaden the appellants' Statement of Issues.").

Even were we to reach the merits of this issue, we would likely reject Dean's argument. While the ASP may not have spelled out the precise mechanism for dismissal, Dr. Cain's letter of June 7, 2007, informed Dean that he was "required to take the USMLE Step 1 exam on or before July 28, 2007," and that once Dean "fulfilled this obligation" his return to the medical school was also conditioned on the outcome of additional obligations. App'x at 313. As Dean was thereby made aware that he faced termination from UBMED if he did not sit and pass Step 1 by this extended deadline, he received the requisite notice of the school's concern with his performance and the corresponding risk of dismissal. *See Horowitz*, 435 U.S. at 85.

Nor was Dean entitled to additional process after the June 7, 2007 letter announcing that no additional leave would be granted. *Horowitz* explicitly declined to apply the "give-and-take" standard to academic dismissals. *Id*. at 86.

32

While Defendants might well have reconsidered whether to dismiss Dean after he failed to sit the Step 1 exam by the deadline, he was entitled only to a decision rendered with due care and deliberation, not to a particular process of continued notice and consideration. Here, the record demonstrates that in considering Dean's several requests for leave, reviewing the medical documentation he submitted, and in subsequently setting (and postponing) the deadline for Dean's third attempt at the Step 1 exam, Defendants made a "careful and deliberate" decision that Dean be dismissed should he fail to comply with UBMED's requirement that he complete Step 1 of the USMLE by July 28, 2007.

Further, through the opportunity to appeal his termination and to seek reinstatement Dean was provided more process than required for an academic dismissal. Dean contends that he had no meaningful opportunity to appeal since the ASP contains no explicit process to appeal a failure to sit for the Step 1 exam and that any appeal would have been futile because it presumably would be taken to Dr. Cain. But UBMED offered Dean no less than what the ASP provides for any other student appeal, and the ASP makes clear that the dean of UBMED renders the final decision in all appeals. In any event, Dean cannot complain that

a process to which he had no entitlement was not conducted in the manner he would have preferred had he availed himself of it.

Accordingly, the district court did not err in granting summary judgment to Defendants on this claim.

**IV. Eleventh Amendment Immunity**

The Eleventh Amendment bars a damages action in federal court against a state and its officials when acting in their official capacity unless the state has waived its sovereign immunity or Congress has abrogated it. *Fulton v. Goord,* 591 F.3d 37, 45 (2009). Because the district court found Dean failed to establish a prima facie case of discrimination, it did not have occasion to address whether the Eleventh Amendment prohibits Dean's money damages claims against UBMED, SUNY, and the individual defendants in their official capacities. As is our usual practice, we leave it to the district court to determine in the first instance whether Defendants are entitled to immunity under the Eleventh Amendment as to the ADA and Rehabilitation Act claims. *See Dardana Ltd. v. Yuganskneftegaz,* 317 F.3d 202, 208 (2d Cir. 2003).

However, we note a growing fracture among the district courts in this Circuit in their approach to determining whether Congress validly abrogated

34

state sovereign immunity under Title II of the ADA. In reciting its understanding

of the relevant standard, the district court, citing *Powell*, stated that to recover

money damages a plaintiff must show a violation of Title II "motivated by either

discriminatory animus or ill will stemming from plaintiff's disability." *Dean*, 2014

WL 1316186, at *6. *Powell* in turn draws this standard from *Garcia v. S.U.N.Y.*

*Health Sciences Center of Brooklyn*, 280 F.3d 98 (2d Cir. 2001), which held that in

enacting Title II Congress exceeded its authority under Section 5 of the

Fourteenth Amendment, "but that Title II suits could be limited to circumstances

in which it had not," *Bolmer v. Oliveira*, 594 F.3d 134, 146 (2d Cir. 2010). Title II

monetary claims against a state therefore require a showing of discriminatory

animus or ill will to limit such suits to disparate treatment that violates the Equal

Protection Clause of the Fourteenth Amendment or falls within the range of

conduct Congress could otherwise prohibit pursuant to its prophylactic

authority. *Id.* at 146; *Garcia*, 280 F.3d at 111–12. Subsequent Supreme Court

precedent concerning the constitutionality of Congress's abrogation of Eleventh

Amendment immunity under Title II calls *Garcia*'s validity into question.

Of particular relevance here, *United States v. Georgia*, 546 U.S. 151 (2006),

reaffirmed that "insofar as Title II creates a private cause of action for damages

35

against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity," *id*. at 159 (emphasis omitted).[5] Given the possibility that the petitioner's amended complaint in *Georgia* might assert Title II claims not independently premised on conduct that violated the Fourteenth Amendment, as well as disagreement among the justices as to the scope of Congress's prophylactic authority, the Court remanded for the lower court to determine,

> on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

*Id*. Thus, *Georgia* explicitly left open the question of whether Congress may validly abrogate sovereign immunity with respect to a particular class of misconduct that violates Title II but does not violate the Fourteenth Amendment.

Continued uncertainty as to the vitality of *Garcia* has led to a divergence in the approaches adopted by district courts in this Circuit in their assessment of

---

[5] In an earlier case, *Tennessee v. Lane*, 541 U.S. 509 (2004), the Court concluded, in a case implicating a fundamental right, that Title II "constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourteenth Amendment," *id*. at 533–34.

Congress's abrogation of sovereign immunity under Title II.[6] Some district courts apply *Garcia*.[7] Others, adopting the approach in *Georgia*, determine whether Congress's purported abrogation of immunity for conduct that violates Title II but not the Fourteenth Amendment is nevertheless valid.[8] We express no position as to the question of whether Congress has validly abrogated sovereign immunity in the context of discrimination in access to public education on the

---

[6] In *Bolmer*, we noted that this Circuit had not yet decided whether *Garcia* survived *Lane* and *Georgia*, but we declined to address the question as we found *Garcia* was limited to Equal Protection Clause claims and thus did not apply to the substantive due process claim at issue. 594 F.3d at 148.

[7] *See, e.g., Frank v. Sachem Sch. Dist.*, No. 14-cv-67(ADS)(ARL), 2015 WL 500489, *12 (E.D.N.Y. Feb. 5, 2015) (applying *Garcia* without discussion of *Georgia*); *Morales v. New York*, 22 F. Supp. 3d 256, 269 (S.D.N.Y. 2014) (same); *Brown v. DeFrank*, No. 06 Civ. 2235(AJP), 2006 WL 3313821, at *26 (S.D.N.Y. Nov. 15, 2006) (acknowledging *Georgia* but applying *Garcia*); *Cabassa v. Smith*, No. 9:08-CV-0480 (LEK/DEP), 2009 WL 1212495, at *14 n.17 (N.D.N.Y. Apr. 30, 2009) (same).

[8] *See, e.g., Goonewardena v. New York*, 475 F. Supp. 2d 310, 323–24 (S.D.N.Y. 2007) (applying *Georgia* and concluding that Congress validly abrogated state sovereign immunity under Title II with respect to discrimination against the disabled in access to education); *Andino v. Fischer*, 698 F. Supp. 2d 362, 377–78 (S.D.N.Y. 2010) (following *Goonewardena* but finding no violation of Title II at the first of the *Georgia* steps); *Ali v. Hogan*, No. 9:12-CV-0104, 2013 WL 5466302, at *11 (N.D.N.Y. Sep. 30, 2013) (adopting *Goonewardena* approach).

37

basis of disability.[9] However, if the district court reaches this issue on remand, it should, at a minimum, evaluate whether the approach erected in *Georgia* applies. *See* 546 U.S. at 158–59.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion.

---

[9] Several of our sister circuits hold that abrogation of state sovereign immunity under Title II in the context of discrimination in access to public higher education for individuals with disabilities falls within Congress's enforcement power under the Fourteenth Amendment. *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 555–56 (3d Cir. 2007); *Toledo v. Sanchez*, 454 F.3d 24, 40 (1st Cir. 2006); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 490 (4th Cir. 2005); *Ass'n for Disabled Americans v. Fla. Int'l Univ.*, 405 F.3d 954, 956-59 (11th Cir. 2005). *But see Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 287 (5th Cir. 2005) (declining to address whether *Lane* extends to disability discrimination in access to public education as no recognized fundamental right was at stake).