13-4096-cv
Noll v. International Business Machines Corp.

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

August Term, 2014

(Argued: October 8, 2014     Decided: May 21, 2015)

Docket No. 13-4096-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ALFRED J. NOLL,

                Plaintiff-Appellant,

      - v.-

INTERNATIONAL BUSINESS MACHINES
CORPORATION,

                Defendant-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Before:          JACOBS, SACK, and DRONEY, Circuit Judges.

Alfred J. Noll appeals from the judgment of the United States District

Court for the Southern District of New York (Baer, J.), granting summary

judgment in favor of International Business Machines Corp. ("IBM").  Noll

contends that IBM refused to reasonably accommodate his deafness when it

declined to caption all the videos and provide transcripts of all the audio files

that are hosted on its corporate intranet, in violation of the Americans with

Disabilities Act and the New York State Human Rights Law.  We conclude that

(I) IBM reasonably accommodated Noll by providing American Sign Language

interpreters capable of translating intranet files, and (II) in light of this

accommodation, Noll has no claim that IBM failed to engage him in an

interactive process.  Affirmed.

Judge Sack dissents in a separate opinion.

EUGENE FELDMAN (Michael A. Schwartz, Disability Rights Clinic, Syracuse University College of Law, Syracuse, New York, on the brief), Law Office of Eugene Feldman, Hermosa Beach, California, for Plaintiff-Appellant.

WILLIS J. GOLDSMITH (Karen Rosenfield, on the brief), Jones Day, New York, New York, for Defendant-Appellee.

DENNIS JACOBS, Circuit Judge:

Alfred J. Noll, a software engineer, sued his employer for disability

discrimination, alleging that International Business Machines Corp. ("IBM") did

2

not accommodate his deafness by arranging that all video files stored on its corporate intranet be captioned when posted and that all audio files likewise be posted with transcripts. Noll asserts claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and appeals from the judgment of the United States District Court for the Southern District of New York (Baer, J.), dismissing those claims on summary judgment. The district court held that IBM reasonably accommodated Noll by providing American Sign Language ("ASL") interpreters capable of translating files at Noll's request and that, in light of this accommodation, Noll has no claim that IBM failed to engage him in an interactive process.

On appeal, Noll argues (I) that the district court overlooked portions of the record creating a factual dispute about the effectiveness of ASL interpreters (and hence, whether they were a reasonable accommodation), and (II) that IBM is liable for failure to engage in an interactive process regardless of whether it provided reasonable accommodation. We affirm.

**BACKGROUND**

Noll, who is deaf, has worked as a software engineer at IBM since 1984, enjoying consistently positive performance reviews. In performing his work, Noll uses several accommodations provided by IBM, including on-site and remote ASL interpreters, as well as measures described as "communication access real-time translation ('CART'), internet based real-time transcription, and video relay services." Noll is active on behalf of IBM employees who are deaf and hearing-impaired, and helped develop many of the company's accommodations for that group.

IBM maintains a corporate intranet for its approximately 440,000 employees worldwide. Content ranges from official management messages to educational and training resources to such personal material as employees' vacation photos. The intranet hosts a huge volume of video and audio files in a number of locations, and thousands of files are continuously being uploaded. IBM's Media Library alone stores over 46,000 video files (and over 35,000 audio files), of which only about 100 videos are captioned.

From 2003 to 2008, Noll frequently asked the Persons with Disabilities program manager at IBM for captioning of particular intranet videos or

transcripts of audio files.  On these occasions, IBM typically provided Noll with transcripts (of both video and audio files) rather than on-screen captioning. However, the process of obtaining transcripts was imperfect: although transcripts were generally made available within five days of Noll's request, they occasionally took longer, and links to transcripts were sometimes broken.

During the relevant period, Noll also had access to ASL interpreters who provided real-time translation services, either on-site or remotely, for intranet content as well as for live meetings.  The process by which IBM employees at the Poughkeepsie office (where Noll worked) could request and get ASL interpreters was coordinated by Noll.

Noll, who is fluent in ASL, regularly used the interpreters when he attended live meetings, and found them to be effective.  Noll disliked using ASL interpreters for videos because he found it "confusing and tiring" to look back and forth between the video and the interpreter.

Noll filed this action on August 15, 2012, alleging that IBM discriminated against him on the basis of his disability, in violation of the ADA and the NYSHRL, by refusing to provide the accommodation he demanded: that, at the time they are posted, all intranet videos be captioned and all audio files have

5

transcripts.  Following discovery, IBM moved for summary judgment on June 18, 2013, arguing, among other things, that (1) the accommodations it provided--including ASL interpreters--were plainly reasonable, and (2) Noll's request that all videos be captioned and all audio files be transcribed was prima facie unreasonable.  The district court granted IBM's motion on the ground that IBM reasonably accommodated Noll by providing ASL interpreters.  The court also rejected Noll's claim that IBM failed to engage in an interactive process, reasoning that such a claim cannot be maintained if the employer provided reasonable accommodation.

On appeal, Noll argues that (I) the district court ignored evidence in the record creating a genuine dispute about the effectiveness of IBM's accommodations, and (II) an employer's failure to engage in an interactive process suffices for a disability discrimination claim, even if reasonable accommodation was made.

## DISCUSSION

We review <u>de novo</u> a district court's grant of summary judgment.  <u>Mario v. P & C Food Markets, Inc.</u>, 313 F.3d 758, 763 (2d Cir. 2002).  Summary judgment

must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[I]n assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 36 (2d Cir. 1994). A genuine issue of material fact is one that "might affect the outcome of the suit under the governing law" and as to which "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

# I

The ADA and the NYSHRL require an employer to afford reasonable accommodation of an employee's known disability unless the accommodation would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); N.Y. Exec. L. 296(3)(a). To maintain a claim under either statute, an employee must show that: "(1) [he] is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, [the employee] could perform the essential functions

7

of the job at issue; and (4) the employer has refused to make such accommodations." McBride v. BIC Consumer Prods. Mfg. Co., Inc., 583 F.3d 92, 97 (2d Cir. 2009) (internal quotation marks omitted); see also Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 n.3 (2d Cir. 2006) ("A claim of disability discrimination under the New York State Human Rights Law . . . is governed by the same legal standards as govern federal ADA claims."). The only issue disputed in this case is whether IBM has refused to provide reasonable accommodations. Noll concedes that IBM provided him with transcripts and ASL interpreters, but argues that those accommodations were unreasonable.

The reasonableness of an employer's accommodation is a "fact-specific" question that often must be resolved by a factfinder. See Wernick v. Fed. Reserve Bank of N.Y., 91 F.3d 379, 385 (2d Cir. 1996). But in a case such as this, in which the employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is "plainly reasonable." Id. In other words, the plain reasonableness of the existing accommodation ends the analysis. There is no need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been reasonable. See U.S.

8

Airways, Inc. v. Barnett, 535 U.S. 391, 400-02 (2002); Borkowski v. Valley Cent. School Dist., 63 F.3d 131, 137-38 (2d Cir. 1995).

A reasonable accommodation is one that "enable[s] an individual with a disability who is qualified to perform the essential functions of that position . . . [or] to enjoy equal benefits and privileges of employment." 29 C.F.R. § 1630.2(o)(1)(ii), (iii). Noll does not dispute that the accommodations provided enabled him to perform the essential functions of his position. Noll's claim is that immediate access to all video and audio postings on IBM's intranet was a benefit or privilege of employment, like a parking space, health insurance, or a locker. See 29 C.F.R. § 1630 app. ("The obligation to make reasonable accommodation applies to all services and programs provided in connection with employment, and to all non-work facilities provided or maintained by an employer for use by its employees[,] . . . [including] employer provided cafeterias, lounges, gymnasiums, auditoriums, transportation and the like."). We will assume that is so for the purpose of this appeal.[1]

---

[1] Noll seizes on a single sentence to argue that the district court deemed IBM's accommodations sufficient because they enabled him to perform his job, and that the court thus failed to consider whether full access to the intranet was a benefit or privilege of employment. We disagree. The district court, which cited and quoted the relevant language of 29 C.F.R. 1630.2(o), clearly considered

Reasonable accommodation may take many forms, but it must be effective. Barnett, 535 U.S. at 400 ("It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness. An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations."); see also Borkowski, 63 F.3d at 139. At the same time, employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee. 29 C.F.R. § 1630 app. ("[Although] the preference of the individual with a disability should be given primary consideration[,] . . . the employer providing the accommodation has the *ultimate discretion* to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." (emphasis added)); cf. Fink v. N.Y.C. Dep't of Personnel, 53 F.3d 565, 567 (2d Cir. 1995) ("[The Rehabilitation Act] does not require the employer to provide every accommodation the disabled employee may request, so long as the

---

benefits and privileges. In any event, the decisive analysis does not turn on a distinction between work-related intranet content, such as educational or training videos, and more informal or personal content.

10

accommodation provided is reasonable.")[2]  All that is required is effectiveness.

The summary judgment record establishes that IBM provided Noll with several accommodations.  He had access to ASL interpreters, received transcripts upon request, and could view certain videos (such as the CEO's Annual Broadcast) with captioning.  Noll argues that the transcripts were inadequate because they were occasionally subject to delays (though most were provided within five days), and that captioning appeared on only a few of IBM's videos.  While there may be disputes of fact as to the timeliness and adequacy of those accommodations, there is no dispute that the ASL interpreters were available to Noll whenever he wished to view a video or access an audio file,[3] and that they translated in real-time.  They were available both on-site and remotely.  And Noll himself helped coordinate interpreter requests (including selection of individual

---

[2]  "[U]nless one of those subtle distinctions [between the ADA and the Rehabilitation Act] is pertinent to a particular case, we treat claims under the two statutes identically."  Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

[3]  Noll objects that although ASL interpreters were provided on demand, they were not provided until video or audio files had already been posted.  That is an odd objection.  The relevant question is whether there was appreciable delay between when Noll wanted to access a video or audio file and when he received such access through an interpreter.  There is no evidence that such a delay ever occurred: qualified interpreters were available, either on-site or remotely, on demand.

interpreters) at IBM's Poughkeepsie office, where he worked. There is no evidence that the interpreters were unqualified or failed to translate fully and accurately. Noll concedes that he regularly used interpreters for work meetings at IBM and found their services to be effective.

Noll nevertheless insists that there is a genuine question of material fact as to the effectiveness of ASL interpreters for intranet videos. First, Noll cites his own deposition testimony that he found ASL interpreters to be "not as effective" as captioning. No genuine material question is raised by that testimony because the law requires an effective accommodation, not the one that is most effective for each employee. Moreover, a pure legal conclusion--whether ASL interpreters were effective--is entitled to no weight at summary judgment. See Patterson v. Cnty. of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004).

Second, Noll cites his affidavit, which says he could not "simultaneously watch the interpreter and the video" because it was "too confusing and tiring [to switch] back and forth between the interpreter and the screen." Although we credit Noll's assertion that it was "tiring and confusing" to divide his visual attention between interpreters and his screen, this disadvantage does not render interpretive services ineffective. A person who is deaf necessarily receives

12

auditory information from the other senses (principally, sight); so it can be expected that many accommodations of deafness--ASL interpretive services as well as captioning--will tax visual attention to some degree.[4]  An accommodation for deafness therefore cannot be rendered ineffective by the need to divide visual attention, without more.  Cf. Fink, 53 F.3d at 567 ("[The reasonable accommodation requirement] does not require the perfect elimination of all disadvantage that may flow from the disability.").  We do not doubt that the need to split visual focus was a disadvantage that likely tired or annoyed Noll.  We hold nevertheless that, in this case, the disadvantage did not render IBM's accommodations ineffective.[5]

---

[4]    According to Noll's own expert, Dr. Jeff B. Pelz, persons with deafness who watch captioned videos use their peripheral vision to rapidly "sample" information from the video and the captions.  Dr. Pelz opines that this technique is very difficult with transcripts (which, unlike captions, do not provide information in real time), but does not address ASL interpretation (which, like captions, *does* provide real-time information).  Likewise, the affidavit from Dr. Paul K. Miller addresses the limitations of transcripts, but does not address the effectiveness of real-time ASL interpretation.

[5]    The dissent acknowledges that a reasonable accommodation need not eliminate *all* disadvantage stemming from disability, but then says that a trial is needed to decide whether ASL interpreters constitute *any* mitigation at all.  Dissenting Op. at 5.  The record confirms the obvious conclusion that Noll's only objection is that ASL interpretation is not optimal and does not obviate all disadvantage of deafness.

Our holding is reinforced by two considerations. First, the term "reasonable accommodation" is defined by regulation to include "the provision of qualified readers or interpreters." 29 C.F.R. § 1630.2(o)(2)(ii). Per se rules are unreliable in the disability context, so ASL interpretive services may not *always* constitute a reasonable accommodation. But according to the regulations, interpreters are a common form of reasonable accommodation. See 29 C.F.R. § 1630 app. ("Part 1630 lists the examples, specified in title I of the ADA, of the most common types of accommodation that an employer or other covered entity may be required to provide.").

Second, Noll concedes that ASL interpreters were effective for live business meetings. There is no evidence that live meetings were somehow less visually demanding or that Noll had to shift his eyes a shorter distance. At meetings, just as with videos, Noll would need to watch the interpreter while simultaneously looking elsewhere to observe the facial expressions and gestures of the speaker, identify who was speaking, and follow any visual aids. Noll does not explain why an accommodation that was effective in the one context was ineffective in the other. At the summary judgment stage, Noll was required to adduce

14

evidence of a decisive difference.[6]  He has not done so.

Circumstances can be conceived in which the provision of interpreters would be less obviously reasonable, or even plainly *unreasonable*, as when technical material cannot be fully and accurately communicated by ASL.  See U.S. E.E.O.C. v. UPS Supply Chain Solutions, 620 F.3d 1103, 1105 (9th Cir. 2010) (noting the lack of a "one-to-one correspondence" between ASL and English).  And not every person who is deaf or hard of hearing is able to understand ASL.  Logistical constraints arising out of the job itself might also make ASL interpretation infeasible or unwieldy.  But a record would be required to document such extraordinary circumstances.

---

[6]  The dissent speculates that attending a meeting does not engage "the same visual and cognitive processes as watching a video," Dissenting Op. at 6, and assumes (oddly) that the visual and cognitive challenges are less (rather than greater) in the meeting context.  There is, however, no evidence of such a difference anywhere in the record.  Although the nonmoving party is entitled to have inferences drawn in his favor at summary judgment, such inferences must be supported by record evidence.  Anderson, 477 U.S. at 249 ("[T]here is no issue for trial unless there is sufficient *evidence* favoring the nonmoving party for a jury to return a verdict for that party." (emphasis added)).  Of course, the moving party bears the burden of showing an absence of material fact in the first place.  Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004).  IBM satisfied that burden by showing that the same ASL interpreters Noll considered effective for meetings were provided for videos.

15

In this case, Noll was fluent in ASL, and there is no evidence that the interpreters IBM provided were unqualified or that the use of interpreters was somehow inconsistent with Noll's position as a software engineer. Noll's sole objection--that he had to look back and forth between an interpreter and his screen--did not, without more, make that accommodation unreasonable.[7]

Because we affirm on this basis, we do not consider IBM's alternative argument that Noll's proposed accommodation was prima facie unreasonable.

## II

"To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation." 29 C.F.R. § 1630.2(o)(3). Noll contends that IBM failed to engage in such a process, and advances an argument that this failure gave rise to an independent cause of

---

[7] The dissent argues that "what works for some or even most individuals with similar disabilities may not work for all." Dissenting Op. at 6. However, Noll's sole objection to ASL interpreters is that he has to look back and forth, and that is a disadvantage that is inherent in the nature of that (sufficient) accommodation.

16

action.[8]  We disagree.

"The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."  Jackan v. N.Y.S. Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000) (citing 29 C.F.R. § 1630.2(o)(3)); see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 218-19 (2d Cir. 2001).  At the same time, we have held that "failure to engage in an interactive process does not form the basis of an ADA claim in the absence of evidence that accommodation was possible." McBride, 583 F.3d at 100-01.  That is because "the ADA imposes liability for . . . discriminatory refusal to undertake a feasible accommodation, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible."  Id. at 100.

We conclude that the corollary is also sound: the ADA imposes no liability for an employer's failure to explore alternative accommodations when the

---

[8]  Noll argues variously that (1) IBM's failure to engage in an interactive process was unlawful given its failure to reasonably accommodate him, and (2) IBM was required to engage in an interactive process *regardless* of whether it provided reasonable accommodation.  Because we conclude, for reasons already discussed, that IBM reasonably accommodated Noll, we need only address the second argument.

17

accommodations provided to the employee were plainly reasonable.  The point of engaging in an interactive process is to "discover[] a means by which an employee's disability could have been accommodated."  McBride, 583 F.3d at 101.  As our sister circuits have concluded, the interactive process is not required when the end it is designed to serve--reasonable accommodation--has already been achieved.  See Rehling v. City of Chicago, 207 F.3d 1009, 1016 (7th Cir. 2000) ("To hold employers liable for the failure of an interactive process regardless of whether a reasonable accommodation was made would not serve the underlying purposes of the ADA, and would, contrary to our own precedent, elevate the ADA's interactive process requirement to an end in itself."); Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 193-94 (3d Cir. 2009); Walter v. United Airlines, Inc., 232 F.3d 892, 2000 WL 1587489, at *5 (4th Cir. 2000) (unpublished table opinion).  Because IBM provided reasonable accommodation to Noll, any failure to engage in an interactive process--even if supported by the record--did not give rise to a discrimination claim.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of the district court.

18

13-4096
*Noll v. International Business Machines Corp.*

SACK, Circuit Judge, dissenting:

In my view, the record before the district court with respect to the attempted accommodation of Alfred J. Noll's disability by his employer, International Business Machines Corp. ("IBM"), did not permit the court to conclude as a matter of law, at the summary judgment stage, that IBM offered Noll a reasonable accommodation for his disability as required by the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* I therefore respectfully dissent.

> A plaintiff suing under the ADA for disability discrimination bears the burden of establishing a prima facie case. In so-called reasonable-accommodation cases, such as this one, the plaintiff's burden requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) *the employer has refused to make such accommodations.*

*Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 183-84 (2d Cir. 2006) (emphasis added) (internal quotation marks omitted). It is undisputed that Noll has carried his burden of showing the first three elements. The only remaining issue, then, is

whether Noll's employer, IBM, has refused to make a reasonable accommodation.

Noll asserts, *inter alia*, that he requires an accommodation for his deafness that would enable him to understand the audio portion of videos made available to IBM employees on the company's intranet.  To that end, he sought to have the company supply the videos to him with the audio portion in writing contained in on-screen captions.  The modification that IBM offered to provide to him, however, was to make available to him American Sign Language ("ASL")[1] interpreters who would, upon his request, interpret the intranet videos simultaneously with his viewing of them.

---

[1] American Sign Language . . . is a complete, complex language that employs signs made by moving the hands combined with facial expressions and postures of the body.  It is the primary language of many North Americans who are deaf and is one of several communication options used by people who are deaf or hard-of-hearing.

. . . .

ASL is a language completely separate and distinct from English.  It contains all the fundamental features of language—it has its own rules for pronunciation, word order, and complex grammar.  While every language has ways of signaling different functions, such as asking a question rather than making a statement, languages differ in how this is done.  For example, English speakers ask a question by raising the pitch of their voice; ASL users ask a question by raising their eyebrows, widening their eyes, and tilting their bodies forward.

Nat'l Inst. on Deafness and Other Commc'n Disorders [NIDCD], U.S. Dep't of Health & Human Servs., *NIDCD Fact Sheet:  American Sign Language*, *available at* http://www.nidcd.nih.gov/health/hearing/pages/asl.aspx (last visited May 14, 2015).

2

IBM was not necessarily legally required to supply Noll with the accommodation he requested. The company, as his employer, was entitled to choose among reasonable accommodations that were available. *See Fink v. New York City Dep't of Pers.*, 53 F.3d 565, 567 (2d Cir. 1995); Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. § 1630 app. (2014). That choice, however, is limited to modifications that are "effective." *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400 (2002) ("An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations." (emphasis in original)).

The question, then, is whether IBM established, in support of its motion for summary judgment, that the ASL modification it stood ready to supply to Noll would have been effective. It seems to me that, to the contrary, Noll has offered evidence "from which a reasonable inference could be drawn" that it would have been *in*effective. *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). He explained, by declaration in opposition to the motion for summary judgment, that "having a sign language interpreter interpret an intranet video is not effective for [him]. The same problem entailed [sic] in reading a transcript while watching a video applies with a sign language interpreter. [He] cannot

3

simultaneously watch the interpreter and the video.  It is too confusing and tiring, switching back and forth between the interpreter and the screen."  Decl. of Alfred J. Noll in Opp'n to Def.'s Mot. for Summ. J. ¶ 28 (J.A.  253) (citation omitted).  His proffered expert evidence also indicates that deaf viewers better comprehend video content with on-screen captions than with modifications that disrupt viewers' peripheral vision.[2]

The majority opinion seems to conclude, although it is not altogether clear to me why, that the ASL interpreters whose services were provided to Noll were plainly reasonable accommodations in the circumstances of this case.  We have said, however, that the "necessarily fact-specific" question whether an employer's proffered modification is effective "must be made on a case-by-case basis."  *Wernick v. Fed. Reserve Bank of New York*, 91 F.3d 379, 385 (2d Cir. 1996).  That "fact-specific" question here is whether under all the facts and circumstances of *this* case, provision of ASL interpreters for the audio of intranet videos to *this* *plaintiff* was a reasonable accommodation.

---

[2] The majority dismisses this evidence on the ground that it "does not address ASL interpretation."  Maj. Op. at 13 n.4.  The Pelz report's conclusions focus on transcripts rather than ASL interpretation, but the report also explains in more general terms that visual comprehension decreases when an individual viewing a video cannot use "peripheral vision to monitor [] video content," as one can when viewing captions.  J.A. 262.

4

The majority concludes that Noll's claimed discomfort does not create a material factual dispute, because "it can be expected that many accommodations of deafness . . . will tax visual attention to some degree." Maj. Op. at 13. But the fact that *all* modifications are imperfect does not mean that *any* modification is effective. An accommodation need not achieve "the perfect elimination of *all* disadvantage that may flow from the disability." *Fink*, 53 F.3d at 567 (emphasis added). But it must achieve *some* elimination of that disadvantage; specifically, enough so that an employee with a disability can "enjoy equal benefits and privileges of employment as are enjoyed by [] other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(iii) (2012). That question is fact-intensive. *See Wernick*, 91 F.3d at 385.

Perhaps the majority is insisting that this case is the exception to the fact-bound rule because ASL interpretation is usually an effective accommodation for deaf or hard-of-hearing employees, and because Noll agrees that ASL interpretation is effective for him in some other settings. *See* Maj. Op. at 14-15. But the reason our decisions require "a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question," *Staron v. McDonald's Corp.*, 51 F.3d 353,

356 (2d Cir. 1995), is that what works for some or even most individuals with similar disabilities may not work for all, and what works in one context for one person with a disability may not work for that same person in a different context. Thus an employer attempting to identify an appropriate accommodation for a particular employee should "identify the *precise* limitations imposed by the [employee's] disability and explore potential accommodations that would overcome *those* limitations."  29 C.F.R. § 1630 app.

ASL interpretation is effective for Noll at in-person meetings.  *See* Maj. Op. at 14.  But that fact is relevant only insofar as we can infer that attending a meeting entails the same visual and cognitive processes as watching a video. IBM has offered no evidence of which I am aware to this effect, and we are, of course, prohibited from drawing inferences in IBM's favor at this stage.  *See Chambers*, 43 F.3d at 36.  It seems to me that, in light of Noll's declaration, whether the accommodation IBM offered is reasonable and effective is a question of fact for a trier of fact at a trial – not for the district court on motion for summary judgment, or for us on appeal.

It is, of course, possible that a trier of fact, after hearing all of the relevant evidence in this case, would conclude that Noll's disabilities were indeed

reasonably accommodated by IBM, a company which, the record suggests, has generally been impressively sensitive and responsive to the needs of its employees with disabilities, including those who are deaf or hard-of-hearing.  I do not think, however, that the record before the district court contained evidence sufficient to permit the court to short-circuit that process by granting the defendant judgment without the input of a trier of fact based upon evidence presented to it at trial.