20-1433
Brooklyn Ctr. for Indep. of the Disabled v. Metro. Transp. Auth.

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2020
No. 20-1433

BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, A NONPROFIT
ORGANIZATION, BRONX INDEPENDENT LIVING SERVICES, A NONPROFIT
ORGANIZATION, HARLEM INDEPENDENT LIVING CENTER, A NONPROFIT
ORGANIZATION, CENTER FOR INDEPENDENCE OF THE DISABLED, NEW YORK A
NONPROFIT ORGANIZATION, DISABLED IN ACTION OF METROPOLITAN, NEW YORK A
NONPROFIT ORGANIZATION, NEW YORK STATEWIDE SENIOR ACTION COUNCIL, A
NONPROFIT ORGANIZATION, SASHA BLAIR-GOLDENSOHN, AN INDIVIDUAL, CHRIS
PANGILINAN, AN INDIVIDUAL, DUSTIN JONES, AN INDIVIDUAL, ON BEHALF OF
THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,
Plaintiffs-Appellants,

v.

METROPOLITAN TRANSPORTATION AUTHORITY, A PUBLIC BENEFIT CORPORATION,
VERONIQUE HAKIM, IN HER OFFICIAL CAPACITY AS INTERIM EXECUTIVE DIRECTOR OF
THE METROPOLITAN TRANSPORTATION AUTHORITY, NEW YORK CITY TRANSIT
AUTHORITY, A PUBLIC BENEFIT CORPORATION, DARRYL C. IRICK, IN HIS OFFICIAL
CAPACITY AS ACTING PRESIDENT OF THE NEW YORK CITY TRANSIT AUTHORITY,
Defendants-Appellees,

THE CITY OF NEW YORK,
Defendants.

ARGUED: MAY 18, 2021
DECIDED: AUGUST 23, 2021

Before:   JACOBS, CABRANES, MENASHI, Circuit Judges.

A certified class of individuals with disabilities, together with six disability-rights organizations, sue the Metropolitan Transportation Authority ("MTA"), the New York City Transit Authority ("NYCTA"), and their respective executive director and president, alleging that the failure to adequately maintain subway-station elevators violates the Americans with Disabilities Act ("ADA"), the Rehabilitation Act ("RA"), and the New York City Human Rights Law ("NYCHRL").  The district court for the Southern District of New York (Daniels, J.) granted summary judgment to the defendants.

We conclude that there are genuine disputes of material fact as to whether frequent and inconvenient elevator outages deprive at least some passengers with disabilities of adequate access to the subway.  However, summary judgment would nonetheless be proper if it can be determined as a matter of law that reasonable accommodations are provided during those outages.  The district court did not reach the issue of reasonable accommodations.  It also did not sufficiently consider the NYCHRL claim.  Accordingly, we **VACATE** the judgment of the district court and **REMAND** for further proceedings consistent with this opinion.

————————————————

STUART SEABORN, Disability Rights Advocates, Berkeley, CA (Jelena Kolic, Disability Rights Advocates, Chicago, IL; Emily Seelenfreund, Disability Rights Advocates, New York, NY; Daniel L. Brown, Sheppard, Mullin, Richter & Hampton, LLP, New York, NY; on the briefs), for Plaintiffs-Appellants.

IRA J. LIPTON (Helene R. Hechtkopf, Miriam J. Manber, Steven M. Silverberg, on the brief), Hoguet Newman Regal & Kenney, LLP, New York, NY, for Defendants-Appellees.

David J. Abrams, Julie R. Fischer, Deva Roberts, Kristine B. Abrenica, Kasowitz Benson Torres LLP, New York, NY, for Amicus Curiae CSY Ventures LLC, d/b/a Up-Stand, in support of Plaintiffs-Appellants.

William A. Burck, Josef T. Ansorge, Stephen A. Broome, Quinn Emanuel Urquhart & Sullivan LLP, Washington, DC and New York, NY, for Amicus Curiae National Disability Rights Network, in support of Plaintiffs-Appellants.

Darin P. McAtee, Cravath, Swaine & Moore LLP, New York, NY, for Amicus Curiae TransitCenter, in support of Plaintiffs-Appellants.

DENNIS JACOBS, Circuit Judge:

A certified class of people with impaired mobility who rely on elevators to access the New York City subway system, along with six disability-rights organizations, allege that the disrepair of subway-station elevators violates Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131–50; section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Code § 8-107(4). Defendants are the Metropolitan Transportation Authority ("MTA"), the New York City Transit Authority ("NYCTA"), and their respective executive director and president. (The defendants are collectively referred to as "MTA," except when distinguishing between the MTA and NYCTA.) The district court (Daniels, J.) granted summary judgment in favor of the MTA.

On appeal, the plaintiffs argue that: (1) genuine disputes of material fact precluded summary judgment on the ADA and RA claims; (2) the district court erroneously deemed their expert evidence and class-member testimony to be immaterial; and (3) the district court applied an improper standard under the NYCHRL.

At the outset, we reject the MTA's argument that this case is non-justiciable. We also reject the MTA's argument that we must consider the accessibility of the transit system as a single unit that includes subways, buses and paratransit.

The district court concluded that the subway system's elevators afford meaningful access for individuals with disabilities, and that the subway system therefore complies with the ADA and RA as a matter of law. This was error. The district court did not consider the plaintiffs' evidence that individuals with disabilities who rely on certain subway stations experience appreciable hardship during elevator outages. However, summary judgment would nonetheless be proper if reasonable accommodations are provided during elevator outages. The district court did not reach the issue of reasonable accommodations. Nor did it independently and liberally construe the NYCHRL, as is required.

Accordingly, the judgment of the district court is vacated, and we remand for further proceedings consistent with this opinion.

## I

Of the 472 subway stations in New York City, 98 are designated ADA-accessible. Across those 98 stations, there are 272 elevators, which together provide subway access to individuals with limited mobility.

The plaintiffs contend that the MTA's maintenance practices are inadequate to reduce unexpected elevator outages to a legally acceptable frequency. An audit by the New York City Comptroller found that just one-fifth of elevators and escalators had undergone all scheduled preventative maintenance. Consultants found that a substantial number of elevators required corrective maintenance within two weeks after a repair, and that the automated system that monitors elevators for service disruptions—"LiftNet"—is outdated, under-tested, and inadequately maintained. The plaintiffs also cite as evidence a handful of elevator inspections, which identified problems including uncleanliness, faulty doors, entrapments, and deficient record-keeping.

Still, system-wide, elevators are in working order an average of 96.5 to 98.7 percent of the time. This range is not disputed by the plaintiffs. Instead, the plaintiffs submitted evidence that commuters who take high-traffic routes during peak hours may encounter elevator outages 8 to 15 percent of the time—much

6

more frequently than the general availability range suggests. The inconvenience of encountering an inoperable elevator is compounded because (1) at most stations, each level is accessible by a single elevator; (2) access to a particular platform often requires use of two to four elevators to travel across multiple levels; (3) about three quarters of stations system-wide lack elevators to begin with, and accessible stations are sparse in some areas; and (4) most elevator outages are unplanned (*i.e.*, not due to scheduled maintenance), making it difficult to arrange alternative transportation in advance.

When an elevator malfunctions, a control desk is notified, either by LiftNet or by station personnel. A crew is dispatched to make any necessary repairs. The MTA submitted evidence showing that elevators are typically repaired within three hours of an outage being reported, and that 95% of repairs are completed within 24 hours.

A critical component of the MTA's program of elevator access is the notice of outages provided to elevator-dependent riders. The MTA reports elevator status on its website and smartphone application ("app"). Customers may subscribe to e-mail and text-message alerts of outages at their preferred subway stations. The website and app include "TripPlanner+," a feature that enables

7

customers to find alternate accessible routes. Permanent physical signs posted at elevators also display alternate routing information.

However, the usefulness of these tools is disputed. The MTA claims that "elevator outages first identified by the LiftNet remote monitoring system [are] verified and thereafter posted to the MTA website within an average of 13.79 minutes after receiving the initial outage report." App. at 683 ¶ 20. (The same presumably goes for the app.) The plaintiffs assert that posting can take up to 45 minutes. While the plaintiffs' higher number does not necessarily contradict the MTA's average figure, questions remain as to how long it takes for an "initial outage report" to be received in the first place, id., and how long it takes to post outages that are not detected by LiftNet at all. The plaintiffs also cite evidence showing that the MTA's website fails to report 20% of outages. And the plaintiffs dispute the extent and clarity of the physical signs posted at elevators.

In addition to the subway, the MTA's public transportation network includes buses and paratransit. All buses are ADA-accessible, and every subway station with an ADA elevator is near a bus stop. There are 326 bus routes and more than 16,000 bus stops. The MTA's paratransit service, Access-A-Ride, is available by reservation, which must be made one to two days in advance.

8

## II

The complaint, filed in April 2017, alleges that, by failing to maintain elevators and provide reasonable accommodations during outages, the MTA violated Title II of the ADA, § 504 of the RA, and the NYCHRL. The district court (Forrest, J.) certified a class of "all persons who use or seek to use the New York City subway system, and have a disability that requires them to use an elevator to access the subway system." App. at 77–78. The parties cross-moved for summary judgment. (The plaintiffs' motion was for partial summary judgment on liability.) Both parties had retained expert witnesses, and the parties cross-moved in limine to exclude each other's expert reports.

In March 2020, the district court (Daniels, J.) denied the plaintiffs' motion for partial summary judgment and granted summary judgment in favor of the MTA. As to the federal claims, the district court reasoned that the plaintiffs focused "on whether [the MTA's] elevators are adequately maintained or replaced to the extent that *they would like*" rather than articulating how the MTA falls short under the ADA and RA standard. Ctr. for Indep. of the Disabled v. Metro. Transp. Auth., 17 Civ. 2990, 2020 WL 1503454, at *5 (S.D.N.Y. Mar. 30, 2020). As to the NYCHRL claim, the court ruled that "[p]laintiffs may not bring a

9

claim under the NYCHRL . . . simply on the basis of extended wait times, when they have not been denied full access to the NYC Subway." Id. at *7. The court also denied both parties' motions in limine, reasoning that "the evidence offered by each of [the] parties' experts would not affect th[e] Court's analysis or determinations as to the parties' cross-motions for summary judgment," so that a decision as to admissibility was unnecessary. Id. at *3 n.4. The plaintiffs now appeal the summary judgment entered in favor of the MTA.

## III

We review de novo a dismissal on summary judgment. See Johnson v. Killian, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). "Summary judgment is warranted only upon a showing 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)). We must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Id. (quoting Terry v. Ashcroft, 336 F.3d 128, 137 (2d Cir. 2003)). "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" Id.

10

(alteration in original) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the RA "'prohibits programs and activities receiving federal financial assistance from excluding, denying benefits to, or discriminating against otherwise qualified' individuals with a disability." <u>Disabled in Action v. Bd. of Elections</u>, 752 F.3d 189, 196 (2d Cir. 2014) (quoting <u>McElwee v. County of Orange</u>, 700 F.3d 635, 640 (2d Cir. 2012)); 29 U.S.C. § 794(a). Mass transportation programs receive federal financial assistance. <u>See</u> <u>Dopico v. Goldschmidt</u>, 687 F.2d 644, 647 n.1 (2d Cir. 1982). Because "the 'standards adopted by [Title II and § 504] are nearly identical, we consider the merits of these claims together.'" <u>Disabled in Action</u>, 752 F.3d at 196 (quoting <u>McElwee</u>, 700 F.3d at 641).

A plaintiff claiming violation of Title II or § 504 must show, in relevant part, that the plaintiff "was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise

11

discriminated against by the defendant because of [the plaintiff's] disability." Id. at 196–97 (quoting McElwee, 700 F.3d at 640). "A public entity discriminates against a[n] . . . individual with a disability when it fails to provide 'meaningful access' to its benefits, programs, or services." Id. at 197 (quoting McElwee, 700 F.3d at 641); accord Henrietta D. v. Bloomberg, 331 F.3d 261, 282 (2d Cir. 2003).

To ensure "meaningful access" a public entity must make "reasonable accommodations in [its] program or benefit." Alexander v. Choate, 469 U.S. 287, 301 (1985); see also Disabled in Action, 752 F.3d at 197 (quoting Henrietta D., 331 F.3d at 273). To determine whether a public entity has failed to make reasonable accommodation, we assess "whether a plaintiff with disabilities 'as a practical matter' was denied 'meaningful access' to services, programs or activities to which he or she was 'legally entitled.'" Wright v. N.Y. Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016) (quoting Henrietta D., 331 F.3d at 273). An "accommodation must overcome structural impediments and non-trivial temporal delays that limit access to programs, services, and activities." Id. at 73.

"[T]he 'reasonableness of an accommodation is a fact-specific question that often must be resolved by a factfinder.'" Id. at 72–73 (alteration omitted) (quoting Noll v. Int'l Bus. Machs. Corp., 787 F.3d 89, 94 (2d Cir. 2015)). "A

12

defendant is 'entitled to summary judgment only if the undisputed record reveals that the plaintiff was accorded a plainly reasonable accommodation.'" Id. at 73 (quoting Dean v. Univ. at Buffalo School of Med. & Biomed. Scis., 804 F.3d 178, 189 (2d Cir. 2015)).

Under Title II, a public transportation "program or activity" must be "readily accessible to and usable by individuals with disabilities." 42 U.S.C. § 12148(a)(1); 49 C.F.R. § 37.61(a). Department of Transportation ("DOT") regulations, promulgated to implement Title II, see 49 C.F.R. § 37.1, et seq., require that the provider of a transportation service must "maintain in operative condition those features of facilities . . . that are required to make the . . . facilities readily accessible to and usable by individuals with disabilities. These features include, but are not limited to, lifts and other means of access to vehicles, . . . elevators, [and] signage," id. § 37.161(a).

When an "accessibility feature" is out of order, it must "be repaired promptly," and "reasonable steps" must be taken "to accommodate individuals with disabilities who would otherwise use the feature." Id. § 37.161(b). At the same time, it is permissible to have "isolated or temporary interruptions in service or access due to maintenance or repairs." Id. § 37.161(c). DOT

regulations implementing § 504, <u>see</u> 49 C.F.R. § 27.1, <u>et seq.</u>, similarly prohibit discrimination based on disability "under any program or activity that receives [f]ederal financial assistance administered by the [DOT]," <u>id.</u> § 27.7(a).

**IV**

The MTA raises two threshold arguments. First, the MTA contends that this case is non-justiciable because it would be "inappropriate" for the court to "become an elevator-repair watchdog." Appellees' Br. at 47. The observation is inarguable as far as it goes but falls beside the point. Federal courts can properly identify conditions that violate federal law. <u>See</u> <u>Disabled in Action</u>, 752 F.3d at 202 ("[T]he undisputed facts demonstrate that [the Board of Elections] fails to provide individuals with meaningful access to its voting program."). It is "in *curing* unlawful conditions" where federal courts owe "restraint and initial deference to state institutional authorities," as "federal courts lack the facilities or expertise to administer plans designed to assure that a state will provide acceptable services." <u>Id.</u> at 204 (emphasis added and alterations and omissions omitted) (quoting <u>Dean v. Coughlin</u>, 804 F.2d 207, 213–14 (2d Cir. 1986)). Still, the district court may conceive of remedies that do not embroil the court in the running of elevators or the subway.

Second, the MTA argues that we must consider whether the transportation system as a whole—including subways, buses and paratransit—is accessible, rather than considering the subway in itself as the system in question. But we need not resolve this question in the abstract because the MTA has committed to making key subway stations accessible. See 49 C.F.R. § 37.53(a)(1) (codifying a settlement agreement to make key subway stations in New York City accessible). The MTA therefore must maintain subway accessibility to the extent that this agreement requires, and it cannot be excused from that obligation because the transportation system as a whole is accessible.

## V

Still, the access afforded need not be total so long as it is "meaningful." Id. at 197 (quoting McElwee, 700 F.3d at 641). As explained below, the subway system considered as a whole provides meaningful access as a matter of law. However, the plaintiffs' argument is that to consider the subway system as a whole is to miss the point: they claim that elevator outages are disproportionately frequent at especially inconvenient stations (usually, the busiest), at especially inconvenient times (usually, rush hour). With this framing

15

in mind, there are genuine disputes of material fact as to whether the subway system presents barriers to meaningful access.

**A.**

The MTA's expert, Dr. Alan Salzberg, found that ADA elevators were available—that is, experiencing no outage—an average of 96.5 to 98.7 percent of the time.[1] The plaintiffs' main critique of Dr. Salzberg's analysis is the omission of elevators that were out of service for "long-term overhaul[s]." App. at 307 ¶ 5. But this critique is a poor fit with their claims. Since plaintiffs complain that failure to conduct adequate maintenance is the chief cause of outage, the inevitable outages for maintenance are not a ground for attacking the sufficiency of service. The plaintiffs otherwise accept Dr. Salzberg's figures as sound, and they do not argue that an overall uptime of 96.5 to 98.7 percent is less than meaningful service. Accordingly, there is no genuine dispute of material fact with respect to the subway system considered as a whole, which (as the district

---

[1] Dr. Salzberg calculated the median and mean elevator availability on both around-the-clock and weekday bases. These calculations generated four key figures: 98.7% (median weekday), 98% (median around-the-clock), 97% (mean weekday), and 96.5% (mean around-the-clock).

court concluded) affords access that is meaningful as a matter of law. But averages can obscure variability, so the analysis does not end here.

**B.**

Plaintiffs' expert Andrew Schwarz assumed arguendo that Dr. Salzberg's calculations were correct, without offering competing figures. Instead, he focused exclusively on high-usage subway routes during rush hours and found that elevator outages resulted in "failed" trips approximately 8 to 15 percent of the time. App. at 848 ¶ 23. The failed-trip rate is expressed as a range because Schwarz used multiple definitions of "failure." The 15% rate includes *any* period of elevator outage during a given hour. The 8% rate assumes that, for a trip to "fail," an elevator outage would have to last for one hour.

Schwarz concluded that "Dr. Salzberg can be 100% correct in his calculations, as I have assumed, and yet it can still be the case that morning commuters from Jamaica Center to Canal Street may have experienced an out-of-service elevator on more than half of their commutes into Manhattan over a year of usage." Id. at 850 ¶ 26. Class member Chris Pangilinan's experience aligns with Schwarz's findings. Over approximately four years, he logged every

17

elevator outage that he encountered, and he calculated an outage rate of 14.9% of his subway trips—on average, 8.9 outages per month.

Relatedly, plaintiffs' expert David Rishel explained that because access to any particular platform often requires two to four elevators, a passenger with a disability may need 40 to 80 elevators over a five-day workweek, and "would be unlikely to experience a week of commuting without encountering one or more inoperable elevators." Id. at 732. Moreover, the NYCTA's Director of Operations Analysis conceded that, at about 88 of the 98 stations designated ADA-accessible, each level or platform is served by a single elevator. Taking these facts together, certain travelers are more likely to encounter elevator outages because of the number of elevators they use per week; and the inconvenience of any single elevator outage can be heightened if there is no other way to access a particular platform.

To illustrate, class member Monica Bartley described taking one elevator to a station's mezzanine only to find that the next elevator she needed was inoperable; she then had to exit the subway station and take a bus. Bartley estimated that she encounters two to three broken elevators per five trips.

18

Similarly, class member April Coughlin described encountering at least five broken elevators per week.

Since fewer than a quarter of subway stations have elevators to begin with, there are limited alternative subway options when an elevator at any particular station is inoperable. Options are of course nonexistent in neighborhoods with no accessible stations—which is the case in 51% of neighborhoods across the Bronx, Brooklyn, Manhattan, and Queens.

In sum, the plaintiffs focus on (i) commuters on high-trafficked routes during peak hours, and (ii) riders who need multiple elevators per trip. The district court erred by declining to separately consider such riders. If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the [plaintiffs], summary judgment is improper." Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir. 1996). Here, the plaintiffs raise a reasonable inference that, for some, access is not meaningful (assuming no accommodations). Likewise, it is reasonable to infer that the MTA is in violation of DOT regulations because, for some, elevator outages go beyond the "isolated or temporary." 49 C.F.R. § 37.161(c).

The plaintiffs' expert evidence therefore contains facts "which might affect the outcome of the suit under the governing law." Wagner v. Chiari & Ilecki, LLP, 973 F.3d 154, 164 (2d Cir. 2020) (quoting Coppola v. Bear Stearns & Co., 499 F.3d 144, 148 (2d Cir. 2007)). The district court's dismissal of the expert evidence as immaterial led to the erroneous conclusion that meaningful access was afforded as a matter of law.

However, at this stage, we cannot conclude that summary judgment is unavailable to the MTA in this case. Although there is a genuine dispute of material fact as to whether at least some passengers with disabilities experience barriers to meaningful access, reasonable accommodations can render access meaningful. See id. at 197 (quoting Henrietta D., 331 F.3d at 273). The district court did not decide whether the MTA provides reasonable accommodation during elevator outages. If it can be determined that reasonable accommodation is provided, then access is meaningful as a matter of law. Accordingly, we go on to consider the accommodations provided during elevator outages.

**VI**

"A defendant is 'entitled to summary judgment only if the undisputed record reveals that the plaintiff was accorded a plainly reasonable

accommodation.'" <u>Wright</u>, 831 F.3d at 73 (quoting <u>Dean</u>, 804 F.3d at 188–89).

The district court reasoned that it did not need to reach the issue of reasonable

accommodation because the plaintiffs failed to identify "an issue with the NYC

Subway that reaches the level of a violation of the ADA or RA." <u>Ctr. for Indep.</u>

<u>of the Disabled</u>, 2020 WL 1503454, at *6. Although the court did not rule on the

issue, it stated that the bus system "does not seem to be an 'accommodation' in

the classic sense" because the bus is "an entirely different mode of

transportation." <u>Id.</u> We have a different view.

It is undisputed that, as of 2019, the MTA Bus Company and NYCTA's

Department of Buses operated 326 bus routes with more than 16,000 stops, that

all buses were ADA accessible, and that every subway station with an ADA

elevator was proximate to a bus stop. The plaintiffs contend that buses offer

"limited and continuously diminishing service coverage," Appellants' Reply Br.

at 23, and cite a document explaining that the MTA Bus Company reduced its

service in 2010. But publicly available maps of New York City bus routes—of

which we take judicial notice, <u>see</u> Fed. R. Evid. 201(b); <u>Mirlis v. Greer</u>, 952 F.3d

51, 63 n.11 (2d Cir. 2020)—illustrate the extensive and ramified bus system[2], and

---

[2] Bus maps can be accessed at the following website: MTA, <u>Maps</u>,
https://new.mta.info/maps (last visited Aug. 3, 2021).

the plaintiffs fail to raise a genuine dispute as to the (post-2019) service coverage. Moreover, the plaintiffs' data covers only the MTA Bus Company; but accessible bus routes are also operated by the NYCTA's Department of Buses. The plaintiffs further argue that the bus is intended "primarily" for intra-borough transit, while the subway is better suited for inter-borough transit. Appellants' Reply Br. at 23 (citing App. at 492). This argument might resonate if the bus were proffered as a substitute for the subway rather than an accommodation and backstop. In any event, buses cross the bridges.

Accordingly, buses should be considered as an accommodation. Although the MTA must provide meaningful access to the subway system itself, it may perform that duty by timely directing passengers to nearby bus stops when an elevator needed for access is out of service. Unlike a theater, a hospital, or a workplace, the New York City subway is not a destination; it is a means of getting from here to there. When a broken elevator prevents subway access, the bus allows passengers to get to the destination.

Still, we cannot determine as a matter of law that the bus system is a *reasonable* accommodation. An "accommodation must overcome . . . non-trivial temporal delays that limit access to programs, services, and activities." Wright,

831 F.3d at 73. There is evidence that delays encountered by class members are non-trivial. As one example out of several in the record, class member Bartley described riding the subway to Grand Central station, where she unexpectedly encountered an elevator outage that prevented her from exiting the station; she had to ride the subway in the opposite direction back to her starting point, where she boarded a bus to her destination. Further, absent adequate notice of an elevator outage, a traveler who requires two or more elevators per trip may use one elevator only to find that a second is broken. It can be seriously burdensome to then ride the first elevator back to street level and proceed to a bus stop. Accordingly, the adequacy of buses as a reasonable accommodation depends, at least in part, on whether a passenger gets prompt notice to go to a bus stop instead of a subway station, or to find a bus if an outage arises in the course of travel.

The MTA does provide notice, but whether that notice is "plainly reasonable" is debated, and in any event was not decided by the district court. Id. (quoting Dean, 804 F.3d at 189). The MTA reports elevator outages on its website and app, and riders may subscribe to e-mail and text-message alerts. Riders may also consult the website or the app for alternative accessible routes.

23

The MTA cites evidence that, on average, elevator outages that are "first identified" by LiftNet are posted to the MTA's website within 13.79 minutes after the "initial outage report" is received. App. at 683 ¶ 20. However, the number of minutes it takes to receive the initial report is not provided, and the plaintiffs cite evidence of LiftNet deficiencies that could add delay.

Therefore, there are factual issues, and the record might need further development or explication. True, the plaintiffs do not dispute the 14-minute average delay; instead, they cite evidence that "most outages are verified and posted to the MTA website within 45 minutes of receipt of notification of an outage." Id. at 576. But there is no arithmetical contradiction between an average delay of 14 minutes and a maximum delay of 45 minutes. And posting a notice of delay before the outage is confirmed (and confirmed to require repair) can disrupt a trip unnecessarily, or needlessly send a passenger to pursue alternatives. Still, we cannot decide in the first instance whether advance notice that lags by 45 minutes—and perhaps even by 14 minutes (plus however long it takes the MTA to become aware of the outage)—is adequate to enable meaningful access, especially in the absence of evidence as to how long the whole process takes from outage to notification. Moreover, the

24

comprehensiveness of the MTA website is disputed. The record contains evidence that the website under-reports outages by 20 percent. Of course, it could be that the outages are not reported if they are brief or quickly fixed; this is also unclear from the record.

Permanent physical signs, posted near elevators and displaying reasonable alternative routes (including via bus), may be part of an accommodation scheme. Although permanent signs do not provide advance or current notice of any particular elevator outage, a permanent sign posted near an elevator can give notice of alternative routing information for passengers who encounter an inoperative elevator en route.

However, the adequacy of the permanent signage in place is disputed. As of 2018, the defendants planned to post permanent signs at each of the 235 NYCTA-owned ADA elevators. The MTA submitted evidence that, by September 2019, permanent signs were installed at 159 elevators. At oral argument, the MTA represented to us that every elevator has a permanent sign. The plaintiffs dispute the adequacy and clarity of these signs, citing evidence that some signs are missing and that some lack alternative routing information. Further, the subway system contains 37 elevators "on the ADA path of travel"

that are not owned or maintained by the NYCTA and may not be included in the plan to post permanent signs.  App. at 291 ¶ 25.  The extent of the permanent signage is thus unclear.

Adequate notice may enable the use of paratransit as a reasonable accommodation in some circumstances.  The MTA's paratransit service, Access-A-Ride, must be reserved one to two days in advance; so it is sometimes impractical.  Cf. Wright, 831 F.3d at 74 (considering the requirement that a prisoner with disabilities must request a mobility aide in advance and concluding that it "prevents [the prisoner] from effectively moving about the facility and discourages him from participating in prison activities").  Then again, the plaintiffs complain primarily of difficulty commuting, and it may be practical for commuters—who generally report to work at the same time and place every weekday—to make advance reservations to cope with a prolonged outage.

In short, it is not clear on the record whether any accommodations provided are "plainly reasonable."  Id. at 73 (quoting Dean, 804 F.3d at 189).  "[T]he 'reasonableness of an accommodation is a fact-specific question that often

must be resolved by a factfinder.'" Id. at 72–73 (alteration omitted) (quoting Noll, 787 F.3d at 94).

Because the district court did not reach the issue of reasonable accommodation, remand for further consideration (and perhaps further development of the record) is appropriate. If the district court concludes that, on the undisputed record, reasonable accommodations are afforded to the class—including those members who experience more frequent and inconvenient elevator outages—then summary judgment is proper.

The expert evidence proffered by the parties has likely bearing on the analysis, assuming of course that evidence is admissible—that is, reliable and relevant. See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993))). We presume that such arguments were advanced in the cross-motions in limine, which the district court summarily denied. Reconsideration of those motions may therefore be a preliminary step on remand. See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment. . . .

27

[A]n expert's report is not a talisman against summary judgment." (citing <u>Beyene</u> <u>v. Coleman Sec. Servs., Inc.</u>, 854 F.2d 1179, 1181 (9th Cir. 1988))).  In any event, the proceedings in the district court will be conducted in accordance with the broad discretion of the district judge.

## VII

The district court granted summary judgment in favor of the MTA on the NYCHRL claim, reasoning that the plaintiffs were not "denied full access" to the subway.  <u>Ctr. for Indep. of the Disabled</u>, 2020 WL 1503454, at *7.  The court relied on <u>Lowell v. Lyft, Inc.</u>, 352 F. Supp. 3d 248 (S.D.N.Y. 2018), in which plaintiffs claimed that they experienced "extended wait times" for wheelchair-accessible rideshare vehicles, <u>id.</u> at 263.  <u>Lowell</u> was dismissed for failure to state a claim because "[w]hile it is a NYCHRL violation to *entirely exclude* a person with a disability from accessing a public accommodation, that [was] not the situation before the [c]ourt."  <u>Id.</u> (emphasis added) (internal citation omitted).  Here, the district court similarly reasoned that, to support an NYCHRL claim, the plaintiffs must have been entirely excluded from the subway—that is, they must have had no access at all.

28

Under the NYCHRL, providers of public accommodations may not, "[b]ecause of any person's . . . disability, . . . refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation." NYCHRL § 8-107(4)(1)(a). The NYCHRL is "construed liberally for the accomplishment of [its] uniquely broad and remedial purposes thereof." Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 75 (2d Cir. 2015) (quoting Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013)). "[F]ederal civil rights statutes can serve only as a floor below which the [NYCHRL] cannot fall." Id. (alteration in original) (quoting Mihalik, 715 F.3d at 109). Accordingly, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [the NYCHRL's] provisions broadly in favor of discrimination plaintiffs to the extent that such a construction is reasonably possible." Id. (quoting Mihalik, 715 F.3d at 109). In short, conduct that does not violate federal law may violate the NYCHRL. See Mihalik, 715 F.3d at 109.

It follows that we must vacate summary judgment on the NYCHRL claim at least to the same extent as on the federal claims. On remand, some

29

independent analysis under the NYCHRL is required, and we "leave it to the district court to interpret any specific, applicable provisions in the first instance." Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 279 (2d Cir. 2009).

## CONCLUSION

We have considered all other arguments advanced by the parties and determined that they are without merit.  Accordingly, the judgment of the district court is vacated, and the case is remanded for further proceedings consistent with this opinion.